Patrick J. McKeever, CA Bar No. 268763
PMcKeever@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Ste 300
San Diego, California 92130-2080
Telephone:  +1.858.720.5700
Facsimile:   +1.858.720.5799

Theresa H. Nguyen, CA Bar No. 284581
RNguyen@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone:  +1.206.359.8000
Facsimile:   +1.206.359.9000

*Attorneys for Roku, Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ANONYMOUS MEDIA RESEARCH HOLDINGS, LLC,<br><br>        Plaintiff,<br><br>  v.<br><br>ROKU, INC.,<br><br>        Defendant. | Case No. 3:24-cv-04171-VC<br><br>**DEFENDANT ROKU, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(c); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:    June 26, 2025<br>Time:   10:00 a.m.<br>Place:   Courtroom 4<br>Judge:  Hon. Vince Chhabria<br><br>**DEMAND FOR JURY TRIAL** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 26, 2025, at 10:00 a.m., or as soon as the matter may be heard in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Roku, Inc. ("Roku") will and hereby moves the Court for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure as to patent-eligibility of U.S. Patent Nos. 8,296,791, 8,510,768, 8,756,622, 10,572,896, 10,719,848 and 10,719,849 under 35 U.S.C. § 101.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities; the pleadings filed in this action; and such other arguments and matters as may be offered at the time of the hearing on this motion.

Dated: April 30, 2025

**PERKINS COIE LLP**

By: */s/ Patrick J. McKeever*
Patrick J. McKeever, CA Bar No. 268763
PMcKeever@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, California 92130-2080
Telephone: 858.720.5721
Facsimile: 858.720.5799

Theresa H. Nguyen, CA Bar No. 284581
RNguyen@perkinscoie.com
1201 Third Avenue, Ste. 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Fax: 206.359.9000

*Attorneys for Defendant Roku, Inc.*

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    PLAINTIFF AMRH'S PATENT FAMILY ...................................................... 1

III.   LEGAL STANDARDS ....................................................................................... 3

       A.     Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) ..................... 3

       B.     Subject Matter Eligibility Under 35 U.S.C. § 101 ............................... 3

IV.    REPRESENTATIVE CLAIMS .......................................................................... 4

V.     THE CLAIMS ARE INELIGIBLE UNDER *ALICE* ....................................... 4

       A.     The Claims are Directed to Abstract Mental Processes.......................... 4

              1.     The Channel Matching Patents ('622 and '849) ....................... 5

              2.     The Scrubbing Patents ('768 and '848) ..................................... 8

              3.     The Playback Tracking Patents ('791 and '896).................... 10

       B.     The Asserted Patents Claims Contain No Saving "Inventive Concept".............. 12

              1.     The Channel Matching Patents ('622 and '849) ..................... 12

              2.     The Scrubbing Patents ('768 and '848) ................................... 14

              3.     The Playback Tracking Patents ('791 and '896).................... 15

       C.     The Complaint does not allege an inventive concept ........................... 15

VI.    CONCLUSION................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

CASES

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
  97 F.4th 1371 (Fed. Cir. 2024) ........................................................................................4

*Alice Corp. Pty. v. CLS Bank Int'l*,
  573 U.S. 208 (2014)............................................................................................... passim

*Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*,
  2022 WL 4093168 (N.D. Cal. Sept. 7, 2022), *aff'd*, 2024 WL 1338940 (Fed.
  Cir. Mar. 29, 2024) ...........................................................................................................3

*Broadband iTV, Inc. v. Amazon.com, Inc.*,
  113 F.4th 1359 (Fed. Cir. 2024) ..........................................................6, 13, 14, 15

*BSG Tech LLC v. BuySeasons, Inc.*,
  899 F.3d 1281 (Fed. Cir. 2018)...........................................................................13, 14, 15

*Chewy, Inc. v. Int'l Bus. Machines Corp.*,
  94 F.4th 1354 (Fed. Cir. 2024) .......................................................................................13

*Diamond v. Diehr*,
  450 U.S. 175 (1981)........................................................................................................14

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014)........................................................................................4

*Dworkin v. Hustler Mag., Inc.*,
  867 F.2d 1188 (9th Cir. 1989) ..........................................................................................3

*EcoFactor, Inc. v. Google LLC*,
  757 F. Supp. 3d 978 (N.D. Cal. 2024) ...........................................................................12

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016).............................................................................5, 8, 12

*Free Stream Media Corp. v. Alphonso Inc.*,
  996 F.3d 1355 (Fed. Cir. 2021)......................................................................................10

*Gottschalk v. Benson*,
  490 U.S. 63 (1972)............................................................................................................5

*In re Killian*,
  45 F.4th 1373 (Fed. Cir. 2022) .........................................................................................5

*Int'l Bus. Machines Corp. v. Zillow Grp, Inc.*,
  50 F.4th 1371 (Fed. Cir. 2022) .......................................................................................13

*Intell. Ventures I LLC v. Symantec Corp.*,
   838 F.3d 1307 (Fed. Cir. 2016)...................................................................7

*Interval Licensing LLC v. AOL, Inc.*,
   896 F.3d 1335 (Fed. Cir. 2018).................................................................10

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
   519 F.3d 1025 (9th Cir. 2008) ...................................................................3

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
   566 U.S. 66 (2012)...................................................................................13

*Mobile Acuity Ltd. v. Blippar Ltd.*,
   110 F.4th 1280 (Fed. Cir. 2024) .............................................................3, 4

*PersonalWeb Techs. LLC v. Google LLC*,
   8 F.4th 1310 (Fed. Cir. 2021) ...............................................................7, 12

*Recognicorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017)..............................................................6, 8

*Samsung Elecs. Co. v. Blaze Mobile, Inc.*,
   673 F. Supp. 3d 1066 (N.D. Cal. 2023) ......................................................3

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018)..............................................4, 8, 12, 15

*Synopsys, Inc. v. Siemens Indus. Software Inc.*,
   No. 20-CV-04151-WHO, 2023 WL 6385609 (N.D. Cal. Sept. 14, 2023) ...............9

*Trinity Info Media, LLC v. Covalent, Inc.*,
   72 F.4th 1355 (Fed. Cir. 2023) ...................................................................5

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017)................................................................14

*Voip-Pal.Com, Inc. v. Apple Inc.*,
   411 F. Supp. 3d 926 (N.D. Cal. 2019), *aff'd*, 828 F. 717 (Fed. Cir. 2020) ...............14

**STATUTES**

35 U.S.C. § 101...................................................................2, 3, 4, 15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6)...............................................................................3

Fed. R. Civ. P. 12(c) ....................................................................................3

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    INTRODUCTION

Patent claims merely covering steps that can be performed in the human mind are abstract and ineligible for patenting.  Analyzing simple patterns in playlists and making straightforward inferences or deductions falls squarely into this category.  Thus, the asserted claims in this case are manifestly abstract at *Alice* step one.  The claims also fail at step two because they recite only generic computer implementation of the mental processes and insignificant, pre-solution activity such as generating the playlists using admittedly prior art content recognition techniques.  None of this amounts to a saving inventive concept.  Accordingly, Roku requests that the Court enter judgment on the pleadings that the asserted patent claims are ineligible for patenting and invalid.

## II.    PLAINTIFF AMRH'S PATENT FAMILY

All six AMRH patents-in-suit claim priority to the same 2004 provisional patent application and 2005 nonprovisional application.  There are three pairs of patents: (1) the channel matching patents, (2) the scrubbing patents, and (3) the playback tracking patents.  Each pair includes one patent with audio-focused claims and one with substantially identical video-focused claims.

| *Alleged Invention* | *Audio Patent* | *Video Patent* |
|---------------------|----------------|----------------|
| Channel Matching | 8,756,**622** | 10,719,**849** |
| Scrubbing | 8,510,**768** | 10,719,**848** |
| Playback Tracking | 8,296,**791** | 10,572,**896** |

All six patents effectively share the same specification.  The three video patents include one additional paragraph that makes no difference for purposes of this motion.

The patents focus on analyzing and manipulating playlist (or "play stream") data indicating what content a user listened to or watched.  Monitoring devices capture audio samples and upload them to a server.  McKeever Decl. Ex. B at 3:4-11; 3:38-43.[1]  The server matches the samples

---

[1] For disclosures common to all the patents-in-suit, Roku cites to the '622 patent.

against a database to try to identify what content the user was listening to. *Id.* at 5:29-33. The server adds each of the match results to the "play stream." *Id.* at 6:13-17; Fig. 4 (410, 450).

The patents do not describe new or improved techniques for recognizing content. In fact, the patents note that "many [content recognition] methods and algorithms exist" and reference prior art content recognition patent applications filed by Shazam and Philips. *Id.* at 5:38-55.

The patents then describe various ways of analyzing and manipulating the play stream data. For example, the play stream can be matched against "channel data" to determine which radio station or album the user may have been listening to. *Id.* at 8:50-56. The play stream can be "scrubbed" to correct bad matches and fill in blanks. *Id.* at 9:32-37. The play stream data can also be analyzed to "deduce" whether the user paused or skipped ahead during playback of the content. *Id.* at 10:63-11:9. Each patent in this case focuses on one of these three processes.

The patents are largely devoid of technical details about how the purported inventions are implemented. Key modules in Figure 1 such as play stream generator 126, play stream scrubber 127, and report generator 130 are described only briefly in purely functional terms. *Id.* at 6:13-27. The same goes for the flowchart steps in Figures 2 and 3. *See id.* at 6:58-9:11. No details are provided for any software or hardware required to practice the claimed inventions either. *See id.* at 13:57-14:20 (generic disclosure of software and computer 700); Fig. 7 (generic computer 700).

On multiple occasions, the Patent Office has rejected similar AMRH patent claims under § 101 as directed to mental processes. A few months ago, the Office rejected a set of "scrubbing" claims and AMRH abandoned the application after an unproductive examiner interview. Roku Req. for Jud. Not., Exs. 1-4. In 2022, the Office rejected a set of playback tracking claims and AMRH again abandoned. *Id.*, Exs. 5-7. Unfortunately, the Office has not consistently applied § 101 to AMRH's applications. The audio patents issued prior to *Alice*, but even as to the three video patents, only the '849 (channel matching) patent received a § 101 rejection. *Id.*, Exs. 8, 9.[2]

---

[2] Inexplicably, AMRH overcame the rejection by simply tacking on the generic step of generating a "media measurement report." *Id.*, Ex. 10. But as discussed *infra*, the Federal Circuit has repeatedly rejected such steps as abstract themselves.

## III.    LEGAL STANDARDS

### A.    Judgment on the Pleadings Under Fed. R. Civ. P. 12(c)

"A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) challenges the legal sufficiency of the opposing party's pleadings and operates like a motion to dismiss under Rule 12(b)(6)" *Samsung Elecs. Co. v. Blaze Mobile, Inc.*, 673 F. Supp. 3d 1066, 1071 (N.D. Cal. 2023), and can be filed at any time "early enough not to delay trial," Fed. R. Civ. P. 12(c). A Rule 12(c) motion is reviewed using the same standard as a Rule 12(b) motion, *Dworkin v. Hustler Mag., Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989), meaning the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

Courts routinely evaluate whether the claims of an asserted patent are patent ineligible under Section 101 at the pleading stage. *See, e.g.*, *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1285 (Fed. Cir. 2024) (affirming Rule 12(b)(6) dismissal finding patent ineligible under § 101); *Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*, No. 21-CV-08294-VC, 2022 WL 4093168, at *1 (N.D. Cal. Sept. 7, 2022) (granting judgment on the pleadings), *aff'd*, No. 2022-2215, 2024 WL 1338940 (Fed. Cir. Mar. 29, 2024).

### B.    Subject Matter Eligibility Under 35 U.S.C. § 101

35 U.S.C. § 101 provides that: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The Supreme Court has held that Section 101 "contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The Supreme Court has articulated a two-step test to determine whether patent claims recite ineligible subject matter. *Id.* at 217–18. First, it is determined whether the claims are directed to a patent-ineligible concept such as an abstract idea. *Id.* at 217. Second, it is determined whether the claims include an "inventive concept"—"an element or combination of

elements" sufficient to transform the claims into something "significantly more" than claims on the patent-ineligible concept itself.  *Id.* at 217–18.

## IV.    REPRESENTATIVE CLAIMS

"Limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are 'substantially similar and linked to the same' ineligible concept."  *Mobile Acuity*, 110 F.4th at 1290.  AMRH's Complaint discusses a representative claim from each patent: '622 patent claim 6; '849 patent claim 10; '768 patent claim 9; '848 claim 9; '791 patent claim 9; and '896 claim 1.  Dkt. 1 at ¶¶ 39, 54, 66, 80, 94, and 108.  These same claims are representative for purposes of this Motion.  *See* McKeever Decl., Ex. A (representative claim listing).  The additional claims in each patent are substantially similar and relate to the same abstract and ineligible mental processes.  Nothing in the other claims shifts the focus of the claims from the abstract mental processes discussed below or adds any transformative inventive concept.  The other claims add minor variations such as further data requirements or processing steps that do not materially impact the analysis at either step of the *Alice* framework.

## V.    THE CLAIMS ARE INELIGIBLE UNDER *ALICE*

### A.    The Claims are Directed to Abstract Mental Processes

Patent claims reciting generic steps for obtaining, analyzing, and manipulating data are regularly held to be abstract.  *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024) ("We have explained that the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract concepts."); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) ("[S]electing certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis ... is all abstract."); *see also Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) ("a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible").

"A 'telltale sign of abstraction'" that frequently arises in these cases "is when the claimed functions are 'mental processes that can be performed in the human mind or using a pencil and

paper.'" *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361–62 (Fed. Cir. 2023) (citations and internal quotation marks omitted).  Recognizing that "[i]nformation as such is an intangible," the Federal Circuit has "treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (citations omitted); *see also In re Killian*, 45 F.4th 1373, 1384 (Fed. Cir. 2022) ("The Supreme Court has long held that mental steps fall within the patent-ineligible category of abstract ideas.") (discussing *Gottschalk v. Benson*, 490 U.S. 63 (1972)).

The patent claims here are plainly directed to simple mental processes for analyzing and manipulating play stream data.  The computer technology recited is limited to the most generic and conventional of components (*e.g.*, "processor," "network," "electronic database").  The patent specifications provide only simple examples to explain the channel matching, scrubbing, and playback tracking concepts and assert that persons skilled in the art could come up with the software for their implementation.  *See* McKeever Decl., Ex. B at 14:3-14 ("The executable instruction code in an electronically readable medium directs the illustrated computer system 700 to carry out various exemplary tasks described herein. … Those skilled in the art will understand that many variations on executable code may be found that implement exemplary methods within the spirit and the scope of the present invention.").

### 1.    The Channel Matching Patents ('622 and '849)

The '622 and '849 patent claims are directed to the abstract idea of matching play stream data to known channel data.  The patents describe "match[ing a] play stream or play list … against known channel data to identify a channel (e.g., an album, samples of an album presented for marketing—e.g. on a web page—, radio broadcast, television broadcast, theater version of a movie, DVD version of a movie, etc.) associated with the elements of the play list or play stream." McKeever Decl., Ex. B at 8:50-55; *see also id.* at 8:9-11 ("Step 209 attempts to identify the channel by searching known channel data to find an apparent content sequence match to the play list.").

'622 claim 6 recites computer instructions for (1) generating a play stream, and (2) matching the play stream against channel data. McKeever Decl., Ex. A at 1. '849 claim 10 is identical except that it recites "video" instead of "audio" and adds a third, generic step of using the inferred channel information to generate a "media measurement report." *Id.* As discussed, the patents concede that generating a play stream merely requires using already known content recognition technology.[3] McKeever Decl., Ex. B at 5:38-55; *see also Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1369 (Fed. Cir. 2024) (conventionality of certain claim elements can help to reveal what claims are "directed to" at *Alice* step one). The claims are thus directed to the channel matching process. *See also* Dkt. 1 at ¶ 21 (alleging that the '622 and '849 patents reflect "a technique that identifies the channel (including, for example, broadcast or distribution channel) by which a user consumed a particular item of media content using a sequential-ordered sequence of at least two content identifiers obtained from the underlying audio or video data samples").

Figure 4 (below) illustrates the simplicity of the channel matching concept. Play stream 450 lists a "sequence of consumed content" for a listener. McKeever Decl., Ex. B at 9:55-59. Known channel data for a radio station and an album (470 and 480, respectively) also consist of sequences of content items. *Id.* at 9:59-63. "Play Stream 450 is searched against known channel data" such as 470 and 480 to identify a matching channel. *Id.* at 9:55-63.

---

[3] Even if generating a play stream were part of the claims' focus, that adds, at most, another abstract mental process. Concertgoers, for example, often keep a mental list of the songs that were performed. But "[a]dding one abstract idea … to another … does not render [a] claim non-abstract." *Recognicorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

**450**
**Clean Play Stream**

| row | log time | content ID |
|---|---|---|
| 1 | $t_0$ | song 51 |
| 2 | $t_0+1$ | song51 |
| 3 | $t_0+2$ | song51 |
| 4 | $t_0+3$ | song51 |
| 5 | $t_0+4$ | song51 |
| 6 | $t_0+5$ | song51 |
| 7 | $t_0+6$ | song51 |
| 8 | $t_0+7$ | song72 |
| 9 | $t_0+8$ | song72 |
| 10 | $t_0+9$ | song72 |
| 11 | $t_0+10$ | song72 |
| 12 | $t_0+11$ | song72 |
| 13 | $t_0+12$ | song72 |
| 14 | $t_0+13$ | song65 |
| 15 | $t_0+14$ | song65 |
| 16 | $t_0+15$ | song65 |
| 17 | $t_0+16$ | song65 |
| 18 | $t_0+17$ | song65 |
| 19 | $t_0+18$ | song65 |
| 20 | $t_0+19$ | song65 |
| 21 | $t_0+20$ | song21 |
| 22 | $t_0+21$ | song21 |
| 23 | $t_0+22$ | song21 |
| 24 | $t_0+23$ | song21 |
| 25 | $t_0+24$ | song21 |
| 26 | $t_0+25$ | song21 |
| 27 | $t_0+26$ | ad49 |
| 28 | $t_0+27$ | ad49 |
| 29 | $t_0+28$ | song35 |
| 30 | $t_0+29$ | song35 |

**480**
**Channel Data for "album 12"**

| row | start time | end time | content ID |
|---|---|---|---|
| 1 | C(0) | C(0)+7 | song51 |
| 2 | C(0)+7 | C(0)+13 | song72 |
| 3 | C(0)+13 | C(0)+23 | song65 |
| 4 | C(0)+23 | C(0)+30 | song29 |

**490**
**Clean Play List**

| row | start log time | end log time | content ID | Channel ID |
|---|---|---|---|---|
| 1 | $t_0$ | $t_0+7$ | song51 | album12 |
| 2 | $t_0+7$ | $t_0+13$ | song71 | album12 |
| 3 | $t_0+13$ | $t_0+20$ | song65 | album12 |
| 4 | $t_0+20$ | $t_0+26$ | song21 | radio35 |
| 5 | $t_0+26$ | $t_0+28$ | ad49 | radio35 |
| 6 | $t_0+28$ | $t_0+30$ | song34 | radio35 |

**470**
**Channel Data for "radio 35"**

| row | start time | end time | content ID |
|---|---|---|---|
| 1 | C(0) | C(0)+6 | song21 |
| 2 | C(0)+6 | C(0)+8 | ad49 |
| 3 | C(0)+8 | C(0)+13 | song35 |

*Id.* at Fig. 4 (excerpted, annotations added). Because play stream 450 contains sequences of content items that match the sequences in channel data 470 and 480, we can infer that the user was listening to "radio 35" and then "album 12" and log those inferences in play list 490.

Matching one sequence of identifiers against another is indisputably a process that can be performed in the human mind. *See, e.g.*, *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1317 (Fed. Cir. 2021) (reasoning that "step of comparing the content-based identifier against other values" was "abstract" and "a mental process"); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (treating claim that filtered emails based on "whether each received content identifier matche[d] a characteristic of other identifiers" as abstract and noting that the "list of relevant characteristics could be kept in a person's head"). Indeed, the matching here is so straightforward that the patents only bother to describe it in the most general of terms. McKeever Decl., Ex. B at 8:50-55. And while '849 claim 10 adds the step of "generat[ing] a media measurement report," that step is also abstract. The claimed report is nothing but a generic output of the channel matching results. *See* McKeever Decl. Ex. B at 6:25-27 ("Results of the media

measurement analysis can be obtained via report generator 130.").  The patents do not describe any particular media measurement reports.  Though not described as such, play list 490 in Figure 4 (above) would seemingly qualify as a media measurement report because it reflects the results of the channel matching.  In any event, analyzing information and then "reporting or displaying the results of the analysis … is all abstract." *SAP*, 898 F.3d at 1167; *see also Elec. Power*, 830 F.3d at 1354 ("merely presenting the results of abstract processes of collecting and analyzing in-formation … is abstract as an ancillary part of such collection and analysis") (citations omitted). Adding another abstract step does not make '849 claim 10 less abstract.  *See Recognicorp*, 855 F.3d at 1327.

### 2.    The Scrubbing Patents ('768 and '848)

The claims of the '768 and '848 patents are directed to the abstract idea of using nearby matches to correct errors in a playlist.  The patents explain that "[b]y analyzing the sequence of data on [a] Raw Play Stream, it is possible to locate and correct any identifications that are likely to be incorrect or to supply missing identifications where the system has not otherwise been able to provide an identification."  McKeever Decl. Ex. B at 9:33-37.

'768 claim 9 recites computer instructions for (1) searching a database to recognize con-tent, (2) generating a play stream listing the content matches, and (3) scrubbing the play stream "to determine whether to change" any of the matches.  McKeever Decl. Ex. A at 3.  '848 claim 9 is identical but recites "video" instead of "audio."  *Id.* at 3.  Again, the patents concede that creating a play stream as recited in the first two steps merely requires using already known content recog-nition technology.  McKeever Decl., Ex. B at 5:38-55.  The focus of the claims is clearly the scrubbing.  *See also* Dkt. 1 at ¶ 20 (alleging that the '768 and '848 patents reflect "a solution by which … a time-ordered sequence of content identifications … [is] analyzed against an expected pattern reference as part of a scrubbing process in order to address missing or incorrect results").

Figure 4 (below) again illustrates the simplicity of the scrubbing concept.



McKeever Decl. Ex. B at Fig. 4 (excerpted, annotations added).  Raw play stream 410 includes two outliers (rows 5 and 16) and two missing identifications (rows 2 and 10).  Because the matches before and after rows 2 and 5 indicate song51, it is assumed the user was listening to song51 for a period of time and those rows are changed to song51.  *Id.* at 9:45-51 ("Given this pattern of sample sequence data, it is reasonable to assume that the person using the corresponding monitor listened to song51 through the time period associated with the audio data of samples 1-7, and thus the 'scrubbed' version of the play stream, i.e. Clean Play Stream 450, indicates song 51 for each of samples 1-7.").  Rows 10 and 16 are likewise "scrubbed" to match their neighboring rows.

Like channel matching, the scrubbing process can easily be performed in the human mind. Anyone can look at raw play stream 410 in Figure 4, spot the outliers and blanks, and apply simple reasoning based on the surrounding matches to correct the outliers or fill in the blanks.  *See, e.g., Synopsys, Inc. v. Siemens Indus. Software Inc.*, No. 20-CV-04151-WHO, 2023 WL 6385609, at *4 (N.D. Cal. Sept. 14, 2023) (classifying "mathematical operation of estimating missing values from an incomplete set of values" in patent claims as "an unpatentable mental process").

That the scrubbing claims do not even specify *how* the scrubbing is performed underscores how abstract these claims are. While the patents' only examples rely on the fact that the matches before and after a given row reference the same content item both (a) to identify the rows to be scrubbed and (b) to modify those rows, the claims are not so limited. Instead, the claims more broadly recite "determin[ing] whether to change a [play stream entry] in view of a pattern of the sample sequence data of the raw play stream *compared to an expected pattern of sample sequence data*." McKeever Decl. Ex. A at 3 (emphasis added). The patents say *nothing* about "expected" patterns of sample sequence data. AMRH thus claimed the concept of correcting play stream entries when they depart from the "expected" without specifying how to identify the entries to be corrected or how to correct them. These claims are abstract because they "simply demand[] the production of a desired *result*"—a scrubbed or "clean" play stream—"without any limitation on how to produce that result." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018) (emphasis added); *see also Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1363 (Fed. Cir. 2021) ("As 'reflected repeatedly in our cases,' a claim must 'ha[ve] the specificity required to transform [the] claim from one claiming only a result to one claiming a way of achieving it' to avoid ineligibility.") (quoting *SAP*, 898 F.3d at 1167-58).

### 3.    The Playback Tracking Patents ('791 and '896)

The claims of the '791 and '896 patents are directed to the abstract idea of analyzing playback data to deduce play-altering actions. The patents describe "play-altering actions or activities" that "manipulat[e] the pace and order in which media is consumed" such as when the user pauses, reverses, fast-forwards, or skips during playback. McKeever Decl. Ex. B at 10:63-11:7. The patents describe a way of "deduc[ing]" whether such play-altering actions have occurred (*e.g.*, whether the user paused or fast-forwarded) by analyzing "content offset values." *Id.* at Abstract.

'791 claim 9 recites a method that uses computers to (1) generate a play stream and (2) "deduce," or identify, play-altering actions of a "monitored audience member" (*i.e.*, user). McKeever Decl. Ex. A at 4. '896 claim 9 is identical except that it recites "video" instead of "audio" and adds a third step of generating a media measurement report. *Id.* As discussed, the patents concede

that generating a play stream uses known content recognition methods. McKeever Decl., Ex. B at 5:38-55. The playback tracking claims are thus directed to the process of deducing play-altering actions. *See also* Dkt. 1 ¶ 22 (alleging that the '791 and '896 patents reflect "a process to deduce actions performed by a user to alter the play of a particular item of identified media content utilizing offset time positions of the content identifications associated with the underlying ACR visual or audio data, and comparing such offset time positions of the content identification results against the time progression of the underlying ACR data samples").

Figure 5 illustrates the process of deducing whether play-altering actions have occurred during playback. Playstream 510 contains a sequence of matched content identifiers as well as "content offsets" indicating the time position within the content that matched the particular sample. McKeever Decl., Ex. B at 11:10-26.



*Id.* at Fig. 5 (excerpted, annotations added). The patents describe spotting "discontinuities in consumption" where the content offset does not increment consistent with the playback time (*i.e.*, the "log time" column). *Id.* at 11:38-55. At rows 1 and 2 of play stream 510, playback appears continuous because the content offset increases by one unit just like the playback/log time. *Id.* at 11:51-55. But at rows 7 and 8 (purple) the content offset jumps ahead *six units*. *Id.* at 12:64-67.

Thus, we can infer the user skipped forward in the content as recorded at row 4 in play list 590. *Id.* at 12:64-67.  Similarly, because the content offset *decreases* between rows 9 and 10 (beige), we can infer that the user skipped backward at that point as logged at row 6 in play list 590.

Here too, this process of deducing play-altering actions can easily be performed in the human mind.  Though the second step in the claims is verbose, the only concrete requirement is *comparing* progressions of content offsets and log times.  McKeever Decl. Ex. A at 4 ("wherein to utilize comprises … comparing a progression of log times … and a progression of content offsets").  The human mind is capable of performing such comparisons and then using them to infer what action likely occurred (*e.g.,* pause, skip).  *See, e.g.*, *PersonalWeb*, 8 F.4th at 1317 (reasoning that "step of comparing the content-based identifier against other values" was "abstract" and "a mental process"); *EcoFactor, Inc. v. Google LLC*, 757 F. Supp. 3d 978, 986 (N.D. Cal. 2024) (treating comparison of temperature-related data over time as an abstract mental process).

As noted, '896 claim 9 adds a third step of "generat[ing] a media measurement report" reflecting the deduced actions.  *See* McKeever Decl. Ex. A at 4.  But as discussed for the similar "media measurement report" step in '849 claim 10, requiring generic output of the result of a mental process is itself abstract.[4]  *See, e.g.*, *SAP*, 898 F.3d at 1167; *Elec. Power*, 830 F.3d at 1354.

### B.    The Asserted Patents Claims Contain No Saving "Inventive Concept"

Turning to *Alice* step two, when the claim limitations are considered individually and as an ordered combination, there are no non-abstract elements sufficient to transform the claims into patent eligible inventions.  Accordingly, there are no saving "inventive concepts" here.

### 1.    The Channel Matching Patents ('622 and '849)

'622 claim 6 generically recites a "computer program product ... comprising instructions for" (1) generating a play stream and (2) matching the play stream to channel data to identify a matching channel.  McKeever Decl., Ex. A at 1.  The claim "amount[s] to nothing 'significantly more' than an instruction to apply the abstract idea … using some unspecified, generic computer."

---

[4] Though not described as such, clean play list 590 in Figure 5 (above) presumably would be an example "media measurement report" because it reflects the deduced play-altering actions.

*Alice*, 573 U.S. at 225-226.  The Supreme Court has explained "that is not '*enough*' to transform an abstract idea into a patent-eligible invention."  *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 77 (2012)) (emphasis original).

The first step recites "generating a play stream" in broad, functional terms.  Far from specifying any specific technical solution, the step generically recites "search[ing] a computerized database of known content."  But "claims to 'an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way' do not suffice at step two."  *Int'l Bus. Machines Corp. v. Zillow Grp, Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022) (citation omitted); *see also, e.g.*, *Chewy, Inc. v. Int'l Bus. Machines Corp.*, 94 F.4th 1354, 1366–67 (Fed. Cir. 2024) (searching "generic database" to match advertisements with search results not inventive).

As discussed, the patents rely on "known content recognition methods" to identify content matches.  McKeever Decl., Ex. B at 5:38-42.  The generation of the play stream is described generically because the play stream is simply the accumulation of the identified content matches.  *Id.* at 6:13-17 ("Play stream generator 126 generates a raw play stream relating a sequence of samples to content identification results (for an example of a portion of a raw play stream, see FIG. [4] and accompanying text).");  Fig 4 (showing raw play stream 410).  *See Broadband iTV*, 113 F.4th at 1370 ("When the patent's specification 'describes the components and features listed in the claims generically,' it 'support[s] the conclusion that these components and features are conventional.'") (citations omitted).  The step of generating the play stream is quintessential pre-solution activity that merely supplies a necessary input (*i.e.,* the play stream data) to the process.  *See Mayo*, 566 U.S. at 79 ("[p]urely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform" a claim at step two) (quoting *Parker v. Flook*, 437 U.S. 584, 590 (1978)).

The second claimed step reflects the abstract channel matching mental process discussed above.  But "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."  *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

'849 claim 10 only adds the abstract "media measurement report" step and thus fares no better at step two.  *See* McKeever Decl. Ex. A at 1.  The patents disclose that such reports are generated by a generic software module (report generator 130) that is mentioned only once.  McKeever Decl., Ex. B at 6:25-27.  Further, putting the results of the channel matching into a report is "insignificant post-solution activity" which does not suffice at step two.  *See Diamond v. Diehr*, 450 U.S. 175, 191–92 (1981) ("[I]nsignificant post-solution activity will not transform an unpatentable principle into a patentable process."); *see also, e.g.*, *Voip-Pal.Com, Inc. v. Apple Inc.*, 411 F. Supp. 3d 926, 950 (N.D. Cal. 2019) (reasoning that step of sending a notification in event of an error was "insignificant post-solution activity"), *aff'd*, 828 F. App'x 717 (Fed. Cir. 2020).

### 2.    The Scrubbing Patents ('768 and '848)

The scrubbing claims fail at *Alice* step two for essentially the same reasons.  '768 claim 9 recites "[a] computer program product … comprising instructions" for (1) searching a database to recognize content, (2) generating a play stream listing the content matches, and (3) scrubbing the play stream "to determine whether to change" any of the matches.  McKeever Decl. Ex. A at 3.  '848 claim 9 is identical but recites "video" instead of "audio."  *Id.* at 3.  Despite using more words, the first two steps recite generating a play stream in functional and generic terms like the channel matching claims.  No specifics are given as to how the database is searched or how the play stream is generated.  Moreover, as discussed, the patents confirm the play stream is generated using preexisting content recognition technologies.  *See Broadband iTV*, 113 F.4th at 1370.

The "scrubbing" and "generating a ***clean*** play stream" steps reflect the abstract idea of scrubbing and thus cannot supply the inventive concept.  *BSG Tech*, 899 F.3d at 1290.  The order of the steps, *i.e.,* generating the play stream *before* "scrubbing" it, is also conventional.  *See, e.g., Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) ("The claim uses a conventional ordering of steps—first processing the data, then routing it, controlling it, and monitoring its reception—with conventional technology to achieve its desired result.").

### 3.    The Playback Tracking Patents ('791 and '896)

The playback tracking claims also fail at *Alice* step two. '791 claim 9 recites a two-step "media measurement method." Again, the first step involves "using one or more computers to generate a play stream …." McKeever Decl. Ex. A at 4. As discussed, this is insignificant pre-solution activity recited generically with functional language. And, again, the patents confirm the play stream is generated using routine and conventional content recognition technologies. *See Broadband iTV*, 113 F.4th at 1370. The second step recites the abstract idea of playback tracking and thus cannot supply the inventive concept. *BSG Tech*, 899 F.3d at 1290. '896 claim 9 merely adds the "media measurement report" step which, as discussed, is not inventive. *See supra* p. 14.

### C.    The Complaint does not allege an inventive concept

Nothing in the complaint indicates the patents are directed to eligible subject matter. Dkt. 1 at ¶¶ 10-22. The complaint focuses on "ACR data" generated using automatic content recognition. AMRH asserts that raw ACR data is "dirty" and that the inventors developed "techniques to process and manage raw ACR data." *Id.* at ¶¶ 16-18. AMRH's own characterizations of the patents generally align with Roku's. *See id.* at ¶¶ 20-22. This confirms that AMRH's patent claims are indeed focused on abstract processes for analyzing and manipulating data.

The complaint does not describe how the patents provide any technical solution to any technical problem. To the extent "dirty" ACR data is a problem, the patents do not describe improved content recognition technologies that generate cleaner ACR data. Instead, they simply try to correct or supplement the data by looking for patterns and then making simple inferences. Even assuming the claimed techniques can make ACR data less dirty, "the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm." *SAP*, 898 F.3d at 1163. "An advance of that nature is ineligible for patenting." *Id.*

## VI.    CONCLUSION

For the reasons set forth above, Roku respectfully requests the Court enter judgment on the pleadings that the asserted claims of the patents-in-suit are ineligible for patenting and invalid under 35 U.S.C. § 101.

Dated: April 30, 2025                                    **PERKINS COIE LLP**


                                                        By: */s/ Patrick J. McKeever*
                                                        Patrick J. McKeever, CA Bar No. 268763
                                                        PMcKeever@perkinscoie.com
                                                        PERKINS COIE LLP
                                                        11452 El Camino Real, Suite 300
                                                        San Diego, California 92130-2080
                                                        Telephone: 858.720.5721
                                                        Facsimile: 858.720.5799

                                                        Theresa H. Nguyen, CA Bar No. 284581
                                                        RNguyen@perkinscoie.com
                                                        1201 Third Avenue, Ste. 4900
                                                        Seattle, WA 98101-3099
                                                        Telephone: 206.359.8000
                                                        Fax: 206.359.9000

                                                        *Attorneys for Defendant Roku, Inc.*

3:24-cv-04171-VC
ROKU'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12c